# VERNON MOORHEAD v. PAUL GRASSLE AND OTHERS.

93 N. W. (2d) 678.

December 26, 1958—No. 37,459.

*C. A. Stark,* for relators.
*Plunkett & Plunkett,* for respondent.

MURPHY, JUSTICE.

Certiorari to review an order of the Industrial Commission reversing a decision of the referee and holding that the relators are liable for

compensation to the respondent under the provisions of M. S. A. 176.215, subd. 1.

From the record it appears that one of the relators, the Carlton Hotel of Rochester, Minnesota, is a copartnership consisting of Laura Grassle, Carlton Grassle, and Paul Grassle. The relator Paul Grassle was also part owner of property adjoining the Carlton Hotel on which were situated two old buildings. These buildings had been condemned as fire hazards, and in April 1953, Paul Grassle made plans to have them torn down and the premises converted into a parking lot for accommodation of guests of the hotel. To do this work it was necessary for him to secure a permit from the city of Rochester. In making application for the permit at the building inspector's office, he represented that he was the owner of the building to be torn down. His name appears in the permit as the contractor.

After obtaining the permit, Grassle hired one Milton Wood to do the actual wrecking of the buildings. In compensation for his work, Wood was to receive the salvage from the wrecked buildings. Milton Wood and several helpers began wrecking one of the buildings, but before work could be begun on the second, Milton Wood left town. It appears from the record that Milton Wood "walked off the job." His father, George Wood, succeeded him in carrying on the salvage work. When the father, George Wood, took over there was no formal agreement entered into with Paul Grassle. It appears that it was George Wood's understanding that he could have the salvage for his work. It also appears that the others who helped both the father and son in the wrecking of the building shared in the salvage or in the proceeds from it.

On August 24, 1953, the respondent, Vernon Moorhead, was hired by George Wood to help in the wrecking of the second building. Although Moorhead was paid $5 a day, the record indicates that this was to be credited against compensation on the basis of $1.50 per hour out of the demolished material valued at $75 per 1,000 feet. On the fifth day of his employment Moorhead was injured by a falling wall, which he was in the process of pulling down.

It appears from the record that, while the work of wrecking the building was in progress, Grassle had been on the job eight or ten times a day directing the progress of the work. He had furnished tools and

other articles that would further the accomplishment of the work. He had made all of the preliminary arrangements for the wrecking operation, including disconnecting water and gas connections, and after the buildings were demolished he arranged to have trees removed and the excavations filled.

In examining the relationship of the parties it should be noted that there was evidence by the respondent to the effect that George Wood told him that he "should take orders from Grassle * * * because he was furnishing the money for the job and do what he told [him] to do and keep working when [Grassle] was around." After he started to work, Grassle told him that the tools which he was using were not the proper kind and arranged to get others for him. On the day of the accident, shortly before its occurrence, there was an argument between George Wood and the respondent which related to the method of bringing down a wall of the old building. There is a conflict as to what was said, Wood claiming that he threatened to have Moorhead removed from the job and Moorhead claiming that he threatened to quit. It appears, however, that while this argument was going on Paul Grassle was present and told both of them in effect to stop arguing and get on with the work. The respondent, Moorhead, further testified:

"Q. Now, while you were on that job did Mr. Grassle ever give you or any of the other men orders as to what was to be done, as to how the work was to be done or how fast it should be done?

"A. Well, he had told us he would like to have us hurry up on it, get it done. Well, at one time I know we took the laths off the floor, the second floor.

"Q. There were some laths on the second floor, was there?

"A. Yes.

\* \* \* \* \*

"Q. And Mr. Grassle told some of the men that he wanted those laths off the floor, did he?

"A. He told us to tear it down so the people could haul it away.

"Q. Did he say why he wanted it off the floor?

"A. Somebody would get hurt falling on it."

Grassle himself testified under cross-examination:

"Q. And you had some concern about this wall standing there over the week-end, is that right?

"A. That's right.

"Q. So as a result, isn't it true that you told the men to speed up the work and get the wall down before the week-end?

"A. I told Mr. Wood that, yes, and the boys."

While the record is not clear as to Milton Wood's background or experience in the wrecking business, it does appear that the father's principal qualification to undertake the job was that he had a truck. The record indicates that he was a rubbish collector, and his prior experience in the wrecking business consisted of tearing down one or two garages. While the work was in progress, he was present on the premises not more than half the time. Grassle furnished some of the tools and materials for the performance of the work. He supplied a mallet, chisels, and the rope which was used to pull down the wall which fell upon the respondent, Moorhead.

The relators contend that neither Grassle nor the Carlton Hotel was the employer of the injured workman. They rely upon the so-called "nature of the work" test, which is recognized in a number of states.[1] They assert that under this test § 176.215, subd. 1, does not apply for the reason that the tearing down of the old buildings was not a part of the regular business of the Carlton Hotel. They concede that the purpose of the statute is to prevent evasion of compensation coverage but argue that its application is limited to the imposition of special compensation liability upon an employer who gets a part of his *regular work* done by the employee of a contractor under him if the intermediate contractor is uninsured. As will appear from the discussion to follow, we are of the view that the statute has a broader application. The issue before us is whether there was sufficient evidence from which the commission could find under the circumstances that the relator partnership was a contractor and Wood was an uninsured subcontractor engaged in work upon the subject matter of the contract within the meaning of § 176.215, subd. 1, which provides:

---

[1]See, 2 Schneider, Workmen's Compensation Text (Perm. ed.) § 326, et seq.

"Where a subcontractor fails to comply with this chapter, the general contractor, or intermediate contractor, or subcontractor is liable for payment of all compensation due an employee of a subsequent subcontractor who is engaged in work upon the subject matter of the contract."

■ A "contractor" is ordinarily understood to be the person who undertakes to supply labor and materials for specific improvements under a contract with an owner or principal. It is ordinarily understood that a "subcontractor" is one who is engaged with a contractor to perform under him some part of the original contract. 9 Wd. & Phr. (Perm. ed.) p. 338. Here, according to the application for permit to do the work, Paul Grassle appears to be both the contractor and part owner. It may be inferred from the record that in addition to being a part owner of the business he was authorized to act for the partnership in the performance of such duties and obligations as a contractor would ordinarily assume in the razing of buildings and establishing a parking lot in place of them. It may be assumed that, when Paul Grassle applied for and received the permit to demolish the buildings, he was obligated to perform the work under such conditions as the city ordinances impose upon a contractor engaged in that particular undertaking. Under the circumstances we find no inconsistency in the status of the relator Grassle in being both the owner and the contractor.

It likewise appears from the record that both of the Woods undertook to perform a part of the undertaking and as compensation for their efforts agreed to accept the salvage and to share the salvage with others whom they might invite to join with them in the performance of the work. Because of the vague and ill-defined agreement between Grassle and the Woods, the record bearing on the matter of the relationship between the parties is not as satisfactory as it might be. Whether the Woods were independent contractors, subcontractors, or employees of the relator partnership was a fact question for the commission to determine. We have held in Ekrem v. Harriet Hubbard Ayer Co. 209 Minn. 337, 296 N. W. 180, that the question of employment is a fact issue, and the findings of the commission cannot be disturbed if fairly supported by the evidence.

Although no hard-and-fast definition can be applied to every case in determining if the relationship of employer and employee exists, a reasonable test was laid out by the court in Lemkuhl v. Clark, 209 Minn. 276, 277, 296 N. W. 28, 29, where it was stated:

"In determining whether the relationship is one of employe or independent contractor, the most important factor is the right of the employer to control the means and manner of performance. Other factors to be considered are mode of payment, furnishing of materials or tools, control of the premises where the work is to be done, and the right of the employer to discharge the employe-contractor. Herron v. Coolsaet Bros. 158 Minn. 522, 198 N. W. 134; Bosel v. Henderson Holding Co. 167 Minn. 72, 208 N. W. 421; 12 Minn. L. Rev. 83."

It is apparent from the record that Grassle had the unquestioned right to control the means and manner of wrecking the buildings. Although there may not have been any detailed exercise of this right, it is the existence of the right and not the exercise of it which is conclusive. Bolin v. Scheurer, 210 Minn. 15, 297 N. W. 106.

We held in Nylund v. Thornberg, 209 Minn. 79, 295 N. W. 411, that:

"Under a permit to cut and remove timber from state land, * * * the holder thereof may be considered a general contractor of the state, so as to be liable to pay workmen's compensation to an accidentally injured employe of a subcontractor who cuts and removes the timber without carrying workmen's compensation insurance * * *."

It is apparent from the facts here that relator Grassle, after having secured a permit from the city to undertake a project involving inherent hazards, delegated an important part of that project to individuals who were not established wrecking contractors who might be expected to carry workmen's compensation insurance. He then permitted them to proceed with the demolition of the building without taking the precaution of requiring them to have compensation coverage. We think on the whole there is sufficient evidence to sustain the finding of the commission that the injured workman was the employee of an uninsured subcontractor to whom the relator partnership as a contractor had

sublet part of the work of tearing down old buildings and establishing a parking lot on the premises. It is our view that the evidence supports the findings that the partnership was a contractor and that George Wood was a subcontractor within the meaning of § 176.215.

■ We have said many times that it is the function of this court upon appeal from a decision of the Industrial Commission to determine whether the evidence is such that the commission might reasonably have come to the conclusion which it did. If so, the findings will not be disturbed unless they are manifestly contrary to the evidence or unless consideration of the evidence and inferences permissible therefrom would clearly require reasonable minds to adopt a contrary conclusion. Sorensen v. P. H. Thompson & Son, 248 Minn. 280, 79 N. W. (2d) 673; Balow v. Kellogg Co-op. Creamery Assn. 248 Minn. 20, 78 N. W. (2d) 430; 21 Dunnell, Dig. (3 ed.) § 10426.

The findings recite that Moorhead "was in the employ of Milton Wood, uninsured sub-contractor" of the partnership. From the record before us it appears that he was employed by George Wood. The case is, therefore, remanded to the Industrial Commission for the purpose of amending its findings to conform to the undisputed evidence on this point and to enter conclusions consistent with this opinion. O'Rourke v. Percy Vittum Co. 166 Minn. 251, 207 N. W. 636.

Respondent is allowed $250 attorneys' fees in this court.

Affirmed.