**COUNTY OF HENNEPIN, Respondent,**

**v.**

**STATE of Minnesota, et al., Appellants.**

**No. 47426.**

Supreme Court of Minnesota.

Feb. 24, 1978.

Rehearing Denied March 27, 1978.

Warren Spannaus, Atty. Gen., C. H. Luther, Deputy Atty. Gen., Paul R. Kempainen, Sp. Asst. Atty. Gen., Dept. of Revenue, St. Paul, for appellants.

Gary W. Flakne, County Atty., Robert A. Burck, Asst. County Atty., Minneapolis, for respondent.

Heard before PETERSON, YETKA, and IVERSON, JJ., and considered and decided by the court en banc.

PETERSON, Justice.

On stipulated facts and exhibits the district court granted Hennepin County judgment declaring that neither the county nor a joint venture known as PMS were liable for Minnesota sales and use tax on raw steel which was sold by a supplier to PMS, fabricated by PMS, and incorporated into the Hennepin County Government Center. We reverse and hold that the sale of the raw steel to PMS was a taxable retail sale under Minn.St. 297A.01, subd. 4, which provides that "[s]ales of building materials, supplies and equipment to * * * contractors, subcontractors or builders for the erection of buildings * * * are 'retail sales' * * *." [1]

The stipulated facts are as follows. Beginning September 9, 1971, an advertisement appeared in a newspaper called the Construction Bulletin seeking bids for "Contract 1542" which was for the "fabrication and erection" of structural steel for the Hennepin County Government Center. There were four bidders for Contract 1542; the low bidder was a joint venture called PMS, the taxpayer in this case. On October 5, 1971, the county issued two contracts to PMS. One was for the fabrication and delivery of structural steel to the jobsite. The other was for the erection of the structural steel on the jobsite. The erection contract was executed about a week later and the revised fabrication contract about a month after that. Both of the contracts refer to the specifications on file for Contract 1542 in stating the work to be performed. The county required a bond from PMS for the fabrication contract and a separate bond from PMS for the erection contract. The county also obtained separate insurance policies.

On a date not disclosed in the record, PMS subcontracted the erection of the structural steel to Larry H. Sowles of Minneapolis. Pursuant to its contracts with the county, PMS purchased raw steel and fabricated it according to Hennepin County specifications. After inspection, the fabricated structural steel was delivered to the jobsite and erected by Sowles under its subcontract with PMS. As work was completed on various portions of fabrication and erection, the county paid PMS pursuant to their two contracts. In light of this stipulated fact it must be presumed that Sowles received payment from PMS.

In 1973 a dispute developed between the county and the state concerning the sales tax liability of PMS for its purchases of the raw steel for the government center project. The county brought this action for a declaratory judgment and stipulated that it would assume responsibility for any sales tax owed by PMS in connection with the project. A notice of audit sent by the Minnesota Department of Revenue to PMS stated this liability was $90,819.99 in tax and interest.

In November 1976 the district court issued findings of fact, conclusions of law, and an order for judgment declaring that neither PMS nor the county was liable for sales or use taxes in connection with the steel used for the government center project. The district court held that PMS was not a contractor, subcontractor, or builder within the meaning of Minn.St. 297A.01, subd. 4, because PMS did not actually perform the work on the erection contract which it subcontracted to Sowles. Instead, the district court held that the sale of the raw steel to PMS was exempt as a "sale of * * * materials" for use in the "industrial production of personal property [i.

1. The statute reflects a legislative determination that construction contractors, subcontractors, and builders are the ultimate users of building materials and supplies. This determination is entirely reasonable since once the contractor, subcontractor, or builder has incorporated the materials or supplies into a building, the materials and supplies lose their identity as personal property and become part of the realty.

e. fabricated structural steel] intended to be sold ultimately at retail [i. e. to Hennepin County]." Minn.St. 297A.25, subd. 1(h). In other words, PMS should be characterized as a supplier to the county rather than a construction contractor since PMS did not actually erect the steel.[2]

In our view, however, it is immaterial that PMS subcontracted the erection to Sowles. The crucial fact in determining whether PMS was a contractor, subcontractor, or builder is that PMS was contractually responsible for both fabrication and erection under its contracts with the county. Under both the tax regulations in effect at the time and the accepted judicial definition of the term, a "contractor" is one who contracts to supply labor and materials. Minnesota Reg. Tax S&U 16(b) (1969); *Moorhead v. Grassle*, 254 Minn. 103, 93 N.W.2d 678 (1958). It is common practice in the construction business for a contractor to subcontract some or all of the work to others, but this does not make the contractor any less a contractor. The contractor still bears contractual responsibility to the owner for the work, even if the contractor or the owner or both expect from the beginning that some of the work will be performed by subcontractors. In this case the fact that Sowles was a subcontractor to PMS only buttresses PMS's status as a "contractor." The county paid PMS, not Sowles, for erection of the steel. Had there been some problem with the erection we can only assume that the county would have looked to its contractor, PMS, and the performance bond which PMS provided to the county in connection with the erection contract.

The county's reliance on *Duluth Steel Fabricators, Inc. v. Commr. of Taxation*, 306 Minn. 567, 237 N.W.2d 625 (1975), is misplaced since that case involved different facts. In that case the taxpayer, Duluth Steel, believed it was a "subcontractor" under the statute. Thus it paid sales tax on its purchase of raw steel but did not charge sales tax to the general contractor to whom it sold the steel after fabrication. A Minnesota Department of Taxation audit found Duluth Steel liable for additional sales taxes since the taxes it erroneously paid on its purchases of the raw steel were lower than the sales taxes it should have collected from the general subcontractors when selling the higher priced fabricated steel. In arguing that it was a "subcontractor" Duluth Steel pointed out that in addition to fabricating and supplying the structural steel to the general contractor for erection, it also drew up detailed plans which the general contractor used in erecting the steel and from time to time sent someone to the jobsite in response to requests from the general contractor to provide "installation advice." 306 Minn. 568, 237 N.W.2d 626. This court recognized that these additional factors narrowed the distinction between suppliers and "contractors, subcontractors or builders" but held that Duluth Steel could best be characterized as a supplier since the general contractor performed the actual erection.

The present case presents different facts. While the taxpayer in Duluth Steel delivered the steel for erection by the general contractor, PMS delivered the steel *and* erected it by means of its own subcontractor. Thus, unlike the taxpayer in Duluth Steel, PMS was at all times contractually responsible for the fabrication and erection of the steel.[3] This brings PMS squarely within the terms contractor, subcontractor, or builder in Minn.St. 297A.01, subd. 4, which provides that "[s]ales of building materials, supplies and equipment to * * * contractors, subcontractors or builders for the erection of buildings * * * are 'retail sales' * * *."

---

**2.** Under this theory the "retail sale" of the fabricated structural steel by PMS to the county would be exempt from taxation as a retail sale to a political subdivision of the state. Minn.St. 297A.25, subd. 1(j).

**3.** If the county had wished to sacrifice the probable advantages of dealing with only one party for both the fabrication and erection of the steel in order to gain advantageous tax treatment, it could have given PMS only the fabrication contract and directly contracted with another party for the steel's erection.

Our conclusion that the sale of the raw steel to PMS was a "retail sale" under Minn.St. 297A.01, subd. 4, has two consequences. First, a sales tax was due under Minn.St. 297A.02. Second, since the raw steel was placed in PMS's hands by a "retail sale," PMS cannot claim exemption under Minn.St. 297A.25, subd. 1(h). That exemption applies only where a taxpayer is purchasing materials "intended to be sold ultimately at retail * * *." The exemption has no application where, as here, the taxpayer acquires the materials by what has been legislatively defined as a retail sale. Since sales tax was due but not paid, PMS is now liable for use tax under Minn.St. 297A.14.

Reversed.

OTIS and SCOTT, JJ., took no part in the consideration or decision of this case.

TODD, Justice (dissenting).

I respectfully dissent from the majority opinion, the result of which is to place form over substance. The legislature in adopting the sales tax act specifically exempted municipalities from the burdens of the act. Obviously, there are situations where municipalities are indirectly involved in the payment of sales tax. However, where governmental construction projects are involved, I believe we should take a liberal view of the actual factual situation to accomplish the legislative purpose of preventing local taxpayers from paying a substantial sum into the general revenues of the state.

Here, PMS originally included an estimate for sales tax in its annual bid. The county deducted the actual tax from the bid and required two separate contracts. This was done both to avoid sales tax problems and to facilitate management of the project. The county was aware at the time of the signing of the two agreements that PMS had absolutely no capability for performing the erection contract and that it would be sublet.

Under these circumstances, I find this case indistinguishable on the *actual facts* from our decision in *Duluth Steel Fabricators, Inc. v. Commr. of Taxation*, 306 Minn. 567, 237 N.W.2d 625 (1975), and would affirm.

KELLY, Justice (dissenting).

I join in the dissent of Mr. Justice Todd.

IVERSON, Justice (dissenting).

I join in the dissent of Mr. Justice Todd.